IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No.: 09 C 7685 |
| v. ) | (04 CR 944) |
| ) | |
| MARC E. THOMPSON, ) | Suzanne B. Conlon, Judge |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is Marc Thompson's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. For the following reasons, the motion is denied.

## BACKGROUND

A jury convicted Marc Thompson on all 19 counts charged, including wire fraud, use of fire to commit a felony, bankruptcy fraud, and money laundering. The convictions arose from Thompson's devious plan to collect on a homeowner's insurance policy and shield the proceeds from creditors. In attempting to conceal his fraudulent scheme, Thompson caused the death of his own mother while attempting to make it appear as if she committed suicide. The underlying facts are fully set forth in the opinion denying his direct appeal. *United States v. Thompson*, 523 F.3d 806 (7th Cir. 2008). A summary is provided here for context.

At one time, Thompson was a successful investment broker and a member of the Chicago Board of Trade. He earned upwards of $1 million a year. His finances unraveled after an acrimonious divorce. He lost his position and began borrowing significant sums of money from business associates and friends. Faced with mounting financial obligations, Thompson began hiding assets from his ex-wife and creditors. In September 2000, he was afforded a brief respite

from his financial troubles when his insurance carrier promptly paid a $50,000 claim for possessions allegedly stolen from his home.[1] In June of the following year, Thompson moved his then 89-year old mother, Carmen, from California to live with him in Chicago on the pretext she would just be visiting. He arranged for her California home to be sold, and then quickly spent most of the proceeds.

Shortly thereafter, Thompson devised a scheme to defraud his insurance carrier by setting fire to his Chicago residence. The scheme would cost Carmen Thompson her life. Thompson increased his homeowner's insurance policy. He began telling others that his mother was acting delirious and suicidal. He went so far as to have a physician prescribe Carmen an anti-psychotic drug without an examination. He paid a trial witness to move boxes of personal belongings from his house to an unattached garage just before the fire. He told his housekeeper that Carmen wanted to go in the basement and burn the house down.

On August 11, 2002, Thompson took two of his sons to a nearby restaurant for dinner. They stopped home afterwards before continuing on to a movie theater. Only ten minutes after their departure, neighbors saw smoke from the house and called 911. Firefighters quickly extinguished the blaze, but found Carmen in the basement, dead of smoke inhalation about four feet from the fire's origin. A Chicago Fire Department investigator opined that the fire was caused by a flammable liquid poured or splashed in the area of origin and ignited with an open flame.

---

[1] Thompson was not charged with fraud relating to his first insurance claim. However, evidence adduced at trial indicates that several expensive possessions that were reportedly stolen in 2000 remained in Thompson's possession. *See* Trial Tr. 1934-49.

2

Thompson arrived home after the fire was under control, and told Chicago Police detectives that his mother acted in a psychotic manner, was taking medications, had previously burned herself, and had talked of committing suicide in the past. The detectives quickly ended their investigation, and the medical examiner declared Carmen's death a suicide.

The detectives and medical examiner were not aware of suspicious circumstances surrounding the fire. Thompson was in financial distress. His account of the night of the fire conflicted with his neighbors' observations. He claimed to have left his home around 6:15 p.m., but neighbors saw him leave around 7:00 p.m., only minutes before they saw smoke. Carmen had physical disabilities that would limit her ability to descend the steep stairs to the basement or carry canisters of incendiary liquids. At the time of her death, she had alcohol, Valium, and the anti-psychotic drug in her system. Valium was prescribed to Thompson, not to his mother. A codicil to Carmen's will dated one week before the fire stated she did not want an autopsy performed in the event of her death and that she wished to be cremated immediately. The attorney who drafted her original will knew nothing of the codicil.

The night of the fire, Thompson called his insurance carrier but waited until the following morning to notify his sister of their mother's death. Thompson ultimately collected over $600,000 in insurance claims as a result of the fire. He wasted little time in transferring most of the money to an offshore account he previously used to hide assets from his ex-wife and creditors. Then, in 2003, Thompson filed for bankruptcy, seeking to rid himself of his outstanding debts. At trial, he admitted fraudulently concealing assets from the bankruptcy court and lying under oath to the bankruptcy trustee.

In August 2005, a jury found Thompson guilty of all charged offenses. This court determined that Thompson deliberately killed his own mother as part of his fraudulent scheme, and sentenced him to 190 years' imprisonment. Thompson's conviction and sentence were affirmed; the Supreme Court denied *certiorari*. *United States v. Thompson*, 523 F.3d 806 (7th Cir. 2008), *cert. denied* 129 S.Ct. 770 (2008).

## LEGAL STANDARD

Section 2255 authorizes a federal prisoner to move the sentencing court to vacate, set aside, or correct a sentence after direct review is completed. The grounds for relief are limited. The sentence must have been imposed in violation of the Constitution or laws of the United States, or the court was without jurisdiction to impose the sentence, the sentence exceeded the maximum allowed by law, or the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). Relief is only available if the sentence involves a jurisdictional or constitutional error or results in a complete miscarriage of justice. *Bischel v. United States*, 32 F.3d 259, 263 (7th Cir. 1994). The court must review the record and draw all reasonable inferences in the government's favor. *Carnine v. United States*, 974 F.2d 924, 928 (7th Cir. 1992).

## ANALYSIS

Thompson's § 2255 motion claims that he had ineffective assistance of trial counsel in violation of the Sixth Amendment, and that the government failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Before turning to the merits, the court first addresses several related issues.

Thompson seeks leave to depose his trial counsel and demands production of documents in their possession, including attorney-client correspondence and work-product files.[2] Thompson also seeks leave to discover documents in the government's possession regarding the fire investigation. Thompson is not entitled to discovery as a matter of course, *Bracy v. Gramley*, 520 U.S. 899, 904 (1997), but the court has discretion to allow discovery upon a showing of good cause. *See* Rule 6 of the Rules Governing Section 2255 Proceedings. Good cause exists if specific allegations show that Thompson may be able to demonstrate a right to relief if the facts were fully developed. *Bracy*, 520 U.S. at 908-09. Discovery must be essential to an adequate factual development of the record. *Id.* This standard is not satisfied here. The government submitted an affidavit from one of Thompson's trial attorneys that adequately addresses many of Thompson's allegations. *See* Government Resp. Ex. 1: Clarke Affidavit. More importantly, for reasons explained below, the allegations in Thompson's § 2255 motion are insufficient to show that his attorneys were constitutionally ineffective or that the government violated its *Brady* obligations. Further development of the record would amount to no more than an unwarranted fishing expedition.

Thompson also requests an evidentiary hearing. A § 2255 motion may be denied without a hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Based on the court's review of the parties' submissions and the record, the court finds that the factual and legal issues can be resolved on the existing record. *See Menzer v. United States*, 200 F.3d 1000, 1006 (7th Cir. 2000).

---

[2] The court appointed two experienced attorneys to represent Thompson at trial under the Criminal Justice Act, 18 U.S.C. § 3006A.

5

The government moves for an order declaring Thompson waived his attorney-client privilege with his trial counsel. The attorney-client privilege is generally waived when a client places his attorney's advice in issue. *Garcia v. Zenith Electronics Corp.*, 58 F.3d 1171, 1175 n. 1 (7th Cir. 1995); *see also Strickland v. Washington*, 466 U.S. 668, 691 (1984) (inquiry into privileged conversations may be critical to assessment of counsel's investigation and litigation decisions). One of Thompson's trial attorneys provided the government with an affidavit responding to Thompson's allegations. *See* Government's Resp. Ex. 1: Clarke Affidavit. The other attorney was reluctant to provide testimony in the absence of a court order explicitly declaring the privilege waived. In light of this opinion and the fact that the present record is sufficient to resolve Thompson's § 2255 motion, the government's motion is moot.

## I. Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, Thompson must show that his attorneys' performance was constitutionally deficient and that he was prejudiced as a result. *Strickland*, 466 U.S. at 688, 694. For representation to be constitutionally deficient, an attorney's performance must fall below an objective standard of reasonableness. *Id.* at 688-89. The performance component of this test is highly deferential to counsel. *Id.*; *United States v. Hatten-Lubick*, 525 F.3d 575, 579 (7th Cir. 2008) (defendant bears a heavy burden in challenging attorney's effectiveness). Counsel are presumed to have made reasonable strategic choices, and "there is a strong presumption that any decisions by counsel fall within a wide range of reasonable trial strategies." *United States v. Lindsay*, 157 F.3d 532, 535 (7th Cir. 1998).

To establish prejudice, Thompson must show there is a reasonable probability that the result of the proceedings would have been different but for his attorneys' errors. *Benefiel v.*

6

*Davis*, 357 F.3d 655, 661 (7th Cir. 2004). A "reasonable probability" is one sufficient to undermine confidence in the trial's outcome. *Strickland*, 466 U.S. at 697. Rather than apply the *Strickland* test, Thompson argues the court should apply the standard set forth in *United States v. Cronic* because his attorneys failed to subject the government's case to meaningful adversarial testing. *See United States v. Cronic*, 466 U.S. 648 (1984). Nothing in the record supports Thompson's accusation. The court finds that the *Strickland* test governs Thompson's claim of ineffective assistance of counsel.

Thompson identifies four areas in which his attorneys' performance was allegedly ineffective: (1) failing to adequately investigate the case; (2) failing to properly advise him of the risks of testifying; (3) failing to exclude inadmissible evidence, proffer exculpatory evidence, and make reasoned arguments; and (4) laboring under a conflict of interest.

### A. Failure to Investigate

Thompson claims he was deprived of effective representation when his attorneys accepted, without independently investigating, the conclusions of Carmelita Wiley-Earls, the Chicago Fire Department investigator who testified that the fire was started intentionally with the ignition of an accelerant poured or splashed on the basement floor. In support of his § 2255 motion, Thompson submits a fire analysis report ("the Beyler report") prepared in 2009 by an independent expert who questions Wiley-Earls' findings, and opines that the cause of the fire should have been classified as undetermined. *See* Thompson's Memorandum, Ex. A: Beyler Report.

Thompson argued on direct appeal that Wiley-Earls' conclusions were unsupported. The Seventh Circuit rejected this "sufficiency of the evidence" argument, noting "the testimony from

Wiley-Earls was but one part of the government's case [at] trial, which included plenty of other evidence from which a rational jury could find that Thompson caused the fire." *Thompson*, 523 F.3d at 810. The Beyler report parallels Thompson's argument to the Seventh Circuit; namely, that the fire could have had an unintentional cause. In contrast to Thompson's direct appeal, the issue here is whether Thompson received effective representation; the court considers the Beyler report only to the extent it is relevant to an assessment of counsels' performance.[3]

An attorney is obligated to conduct a reasonable investigation or to make reasonable decisions that render particular investigations unnecessary. *Strickland*, 466 U.S. at 690-91. Defense counsel is not required to investigate every conceivable line of evidence so long as the decision to forego a particular investigation is supported by a reasonable professional judgment. *Id.* at 521; *Adams v. Bertrand*, 453 F.3d 428, 436 (7th Cir. 2006). The responsibility is on Thompson to overcome the presumption that, under the circumstances, the challenged decision might be considered sound strategy. *Strickland*, 466 U.S. at 689. The government contended that Thompson started the fire and staged it to look like a suicide. Defense counsel tried to persuade the jury that Thompson's mother, Carmen, started the fire as a means to commit

---

[3] Nonetheless, the court does not find the Beyler report casts any doubt as to Thompson's guilt. Although Dr. Beyler has an impressive background in fire safety and protection research, it is not clear from his curriculum vitae whether he has specialized knowledge in determining the cause and origin of residential fires. *See* Thompson's Memorandum, Ex. A: Beyler Report, at A1-A8. Dr. Beyler's report includes a list of representative cases in which he has testified, but there is no indication that his expert testimony bore on arson-related investigations. *Id.* at A9-A11. The report's attempt to account for the physical evidence is highly speculative and dismissive of the incriminating evidence. The report's conclusions are also difficult to reconcile with the trial evidence. Dr. Beyler fails to scientifically explain how, in the absence of an accelerant, the fire could have started in the basement ceiling and remained undetected by Thompson or his sons while they were in the house, but have spread quickly enough to draw the neighbors' attention within ten minutes of Thompson's departure.

8

suicide. An investigation seeking to establish that the fire's cause was undeterminable would not have been strong support for the defense's theory. Even if Thompson's counsel had pursued a different strategy, one seeking to establish the fire's cause as accidental, the strategy would not likely have resulted in an acquittal given overwhelming other evidence. Counsels' strategy, and the corresponding decision not to challenge Wiley-Earls' findings, was objectively reasonable.

Before and after the fire, Thompson told several trial witnesses, including his housekeeper and Chicago Police detectives, that his mother was suicidal and wanted to burn the house down. One of the detectives who responded to the fire found matches and burn marks in Carmen's bedroom. Only three nights before the fire that took her life, Thompson took Carmen to a local hospital for a burn injury to her shoulder, claiming Carmen had burned herself when left alone. The injury could have been construed as an unsuccessful suicide attempt. Carmen's body was found only feet from the fire's origin, and nearly empty cans of accelerants were found nearby. A responding firefighter and Wiley-Earls detected the smell of an accelerant at the scene of the fire. The evidence supported the government's theory that Thompson staged the fire to make it look like a suicide, especially when viewed in light of Thompson's greed, financial troubles, and conflicting statements. But the evidence was also consistent with the defense's theory that Carmen started the fire intentionally to carry out her previous threats. It was the jury's province to decide credibility. The jury was not persuaded that Thompson's version of events raised a reasonable doubt about his guilt.

Thompson maintains that his trial attorneys did not provide counsel as guaranteed by the Sixth Amendment because they did not advance an alternative theory that the fire's cause was undeterminable. It is not the court's role to second-guess Thompson's attorneys as to which was

the better of two possible strategies. *Smith v. Gaetz*, 565 F.3d 346, 354 (7th Cir. 2009). "After all, it is 'all too easy to for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). In light of the evidence that the fire was intentionally started and Thompson's prior statements that his mother was suicidal, counsels' suicide strategy fell within objective standards of reasonableness.

Thompson claims his attorneys failed to investigate the potential testimony of a second expert witness the government had planned to use. Although Thompson's § 2255 motion identifies the proposed witness only as "a retired ATF investigator," he appears to be referring to Jack Malooley. *See* Thompson's Memorandum at 6 and Ex. F. Prior to trial, the government indicated it might elicit testimony from Malooley as to the fire's cause and origin as well as its duration and destructive force. *Id.* at Ex. F. When a defendant accuses his attorneys of failing to investigate his case, he bears the burden of providing the court with sufficiently precise information as to what the investigation would have produced. *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003). Thompson does not provide the court with any information about what his attorneys might have discovered, nor does he explain why the information would have changed the outcome of the trial.

Thompson contends his attorneys failed to examine his homeowner's insurance policy. Had they done so, Thompson claims they would have learned that the policy excluded coverage for losses caused by an intentional act of a household member. Given this policy provision, he argues there was no incentive for him to stage his mother's death as a suicide. Thompson raised

this point when challenging the sufficiency of the evidence on direct appeal. As the Seventh Circuit stated:

> Even if this interpretation of the policy is true, what matters is Thompson's belief that he would be paid, not whether he was correct in that belief. The evidence suggested that Thompson believed he would be paid. In a previous claim to the same insurance company based on an alleged burglary, Thompson received prompt payment without investigation. In addition, Thompson requested a copy of the policy after the fire, suggesting that he was not familiar with all its provisions.

*Thompson*, 523 F.3d at 812 n. 1. Moreover, Thompson's insurance carrier did in fact pay him over $600,000, notwithstanding the fact that the cause of the fire was originally attributed to an intentional act on his mother's part. Thompson does not satisfy his burden of demonstrating that the presentation of his complete insurance policy would have had a reasonable probability of changing the result of the trial.

### B. Failure to Explain the Risks of Testifying

Thompson contends his trial attorneys failed to explain the risks of testifying to him. He asserts that, but for this failure, he would not have testified at trial and been thoroughly impeached with his prior history of dishonesty and fraud. One of Thompson's trial attorneys disputes the allegation, noting Thompson was advised not to testify because his prior dishonest conduct would be brought out on cross-examination. *See* Government's Resp. Ex. A: Clark Affidavit.

Thompson fails to satisfy his burden of proof and persuasion on this claim. He offers nothing more than an unsubstantiated, self-serving affidavit to bolster his allegation. That is insufficient to justify relief under § 2255. *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991). Even though made under oath, the court finds Thompson's affidavit lacks credibility. He is an admitted perjurer, having lied under oath numerous times in his divorce and bankruptcy

11

proceedings. His claim is also belied by the record. He obviously recognized he would be impeached with his past. During direct examination, he acknowledged his history of lying and fraud to draw the sting from the government's subsequent cross-examination. Thompson's present argument that he was not fully prepared for the government's cross-examination is refuted by his testimony on direct examination and is insufficient to overcome the strong presumption that his attorney's advice was reasonable and effective.

### C. Failure to Exclude Admissible Evidence, Proffer Exculpatory Evidence, and Make Reasoned Arguments

Thompson raises a dozen evidentiary issues that he believes demonstrate his attorneys' ineffectiveness. First, he asserts his attorneys should have moved to exclude evidence concerning an injury Carmen suffered only days before the house fire. On August 8, 2002, Thompson brought his mother to a local hospital after she sustained a first-degree burn to her shoulder. He maintained that Carmen hurt herself on the stove when left alone. There is no sound basis to second-guess counsels' decision not to challenge this evidence. It was as relevant to the defense's suicide theory as it was to the government's. The defense described the incident as Carmen's unsuccessful attempt to take her own life and burn down the house, threats Thompson told other witnesses she made before her death in the house fire. The jury apparently chose not to believe Thompson's version of events. An adverse credibility effect does not render counsel ineffective. *See Strickland*, 466 U.S. at 689 (the court must avoid the distorting effects of hindsight and give counsel a strong presumption of reasonableness).

Thompson claims his attorneys erroneously failed to object when his housekeeper testified as to a conversation she had with Carmen; Carmen stated that Thompson's son had pushed her. Thompson argues the testimony was prejudicial and improperly impeached his son. This

12

particular testimony arose only as an explanation for an incident in which the housekeeper found Carmen covered in food. Even assuming the testimony was excludable, counsel could reasonably have declined to object so as not to draw the incident to the jury's attention. *Hardamon*, 319 F.3d at 949. More importantly, Thompson cannot establish prejudice. No further mention of this incident involving Carmen and his son was made throughout the trial. Thompson's son later testified, but the government did not question him about this incident. Given all the evidence against Thompson, there is no reasonable basis to conclude that the exclusion of this testimony would have affected the outcome of the trial.

Thompson argues his attorneys were ineffective for failing to object to testimony provided by one of Carmen's former California neighbors, who stated that both she and Carmen disliked going down into basements. Again, assuming the statement was inadmissible hearsay, the government presented substantial evidence that Carmen's physical condition rendered her unable to descend the steep basement stairs in Thompson's home on her own, much less carry heavy cans of accelerants. There is not a reasonable probability that the result of the trial would have been different but for the neighbor's comment.

Thompson contends his attorneys should have objected to testimony of Celina Cesarz concerning the handling of claims by Thompson's insurance carrier, Chubb Insurance ("Chubb"). Cesarz testified that Chubb was a high-value insurance company that promptly paid claims with few questions asked. Thompson argues Cesarz was not a Chubb employee and lacked the competence to opine about Chubb's practices. However, Cesarz worked for an insurance agency that sold insurance for several carriers, including Chubb. During the relevant time, she assisted in processing Chubb's insurance claims. Her testimony established a thorough familiarity with

13

Chubb's claims policies. *See* Trial Tr. 950-73. Thompson's conclusory argument does not demonstrate that Cesarz was incompetent to testify about Chubb's practices, nor does Thompson establish the level of prejudice necessary for relief. Thompson himself admitted during cross-examination that Chubb paid his $50,000 claim in 2000 after only briefly speaking with him on the phone.

Thompson argues his attorneys were ineffective for failing to object when the government introduced into evidence the court file in Thompson's divorce proceedings. Some of the divorce pleadings contained allegations of Thompson's dishonesty and threatening behavior. Even if counsel should have objected to the file's introduction into evidence or at least insisted on redactions, Thompson cannot show that he suffered prejudice as that term is used by the Supreme Court. *See Strickland*, 466 U.S. at 694 (defendant must show a probability sufficient to undermine confidence in the outcome). Thompson never disputed that his divorce was contentious. Furthermore, overwhelming evidence supported the jury's verdict. Counsels' failure to object to the admission of the court file, even if unreasonable, was not so substantial as to undermine confidence in the outcome of the trial.

Next, Thompson complains that counsel should have objected to testimony provided by Earl Combs, Thompson's former business associate, on the ground that it was irrelevant and prejudicial. Combs testified about Thompson's financial troubles and failure to pay personal debts. The evidence was relevant, at a minimum, to establish Thompson's motive to commit fraud. Combs' testimony cannot be viewed as unfairly prejudicial when Thompson himself admitted to hiding money from creditors and failing to repay significant sums of money borrowed from acquaintances.

Thompson argues his attorneys were ineffective for not moving to suppress the fruits of government searches of his residence, business, and storage locker. He provides no facts or developed argument supporting this claim. The court is thus left in the dark as to why counsel should have suspected the searches violated the Fourth Amendment. Vague and unsupported claims are insufficient to overcome *Strickland*'s presumptions. *United States v. Herrera-Rivera*, 25 F.3d 491, 497 (7th Cir. 1994).

Thompson complains that his attorneys failed to present evidence that one of his neighbors spoke with him before he left for the movie theater on the night of the fire. This evidence would allegedly undercut the government's theory that Thompson left in a hurry minutes before the fire. Thompson does not provide an affidavit from the neighbor, only a police report summarizing a detective's interview with her. *See* Thompson's Reply Ex. F at 13. One need not look any further than the police report to understand why counsel reasonably refrained from calling the neighbor as a witness. The report states: "As [Thompson] was leaving his house, [the neighbor] talked to him about cutting down a tree in the back yard. [Thompson] told [the neighbor] that he did not have time to speak to her about the tree at this time because he was in a hurry. [Thompson] then left." *Id.* The neighbor's observations are incriminating, not exculpatory.

Thompson argues counsel was ineffective for failing to elicit two key pieces of evidence from him when he testified: (1) he moved personal belongings into the garage before the fire as part of his effort to sell his house; and (2) even after doing so, there was still room left in the garage. His argument is undermined by the record. On direct examination, Thompson told the jury why he was moving items into the garage:

Q: Why were you moving stuff out of the basement and out of your room?

> A: I could never show the house with the amount of stuff that was in the basement and up in my bedroom . . .

Trial Tr. 1847. During cross-examination, Thompson had the opportunity to rebut a prior witness' testimony about the quantity of belongings in the garage:

> Q: Okay. So you're saying that the garage wasn't that full, Scott Cooper is wrong. Is that what you're saying.
>
> A: The garage was not so full that I couldn't park the car in it.

*Id.* 1957. Thompson does not explain what more could have been done to elicit this evidence. The jury heard the evidence that Thompson wanted them to hear. He cannot establish prejudice under *Strickland*.

Thompson alleges his attorneys were deficient for not eliciting testimony from his insurance broker that he increased his insurance coverage just before the fire at the broker's suggestion. However, he does not provide any factual support for this claim. Nothing in the trial record or Thompson's § 2255 submissions establishes that Thompson's broker instigated the increase in coverage. Thompson does not even make such an assertion in his affidavit. At trial, Thompson was questioned about the coverage increase and he never mentioned it was done at the broker's urging. *See* Trial Tr. 1950-53. Thompson's present argument is not supported by the record.

Thompson argues his attorneys failed to elicit testimony that the medical examiner was required to perform an autopsy, regardless of Carmen's will, and that Thompson did not attempt to prevent the medical examiner from performing an autopsy. Again, Thompson's allegations are unsupported by facts. He also eschews any attempt to show how such testimony (if obtainable) would have affected the jury's verdict. What mattered was Thompson's subjective belief

16

regarding Carmen's will codicil, not its actual effect under state law. Thompson fails to satisfy his burden of proof and persuasion.

Thompson further contends that his trial attorneys were ineffective for failing to object to the prosecutor's comments during closing arguments. To establish an ineffective assistance claim based on counsels' failure to object during closing arguments, Thompson must show the prosecutor's comments "so infected his trial with unfairness that it caused the jury to reach a verdict of guilty when otherwise it might have reached a verdict of not guilty." *Pisciotti v. Washington*, 143 F.3d 296, 301 (7th Cir. 1998) (internal quotation omitted). Thompson identifies three instances of allegedly objectionable comments; in each instance, he claims the government's argument was not supported by evidence. The court has reviewed the comments and finds they were all within permissible bounds. The court instructed the jury immediately before and after closing arguments that statements made by the attorneys are not evidence. Trial Tr. 2049, 2137. Thompson has not shown that counsel was unreasonable in not objecting, nor has he shown that the outcome of his case would have been different had counsel objected.

## D. Conflict of Interest

Thompson asserts that one of his trial attorneys, Robert Clarke, operated under a conflict of interest. While a showing that a conflict of interest adversely affected his attorney's performance obviates the need to demonstrate prejudice, Thompson cannot establish the constitutional predicate for his ineffective assistance claim without evidence that his attorney actively represented conflicting interests. *Gonzales v. Mize*, 565 F.3d 373, 381 (7th Cir. 2009). Clarke moved to withdraw as Thompson's counsel several weeks after the jury rendered its verdict based upon interactions between Thompson and another client of Clarke's housed at the Metropolitan

17

Correctional Center. Government Resp. Ex. 1: Clarke Affidavit. The court later granted Clarke's withdrawal *nunc pro tunc* as of the date of the verdict. *See* Oct. 28, 2005 Sentencing Hearing at 3-5. The circumstances requiring Clarke's withdrawal did not arise until after the verdict, and Clarke took no actions on Thompson's behalf while the conflict existed. *Id.*; Government Resp. Ex. 1: Clarke Affidavit. After granting Clarke leave to withdraw, the court appointed another experienced defense attorney to assist Thompson's remaining trial counsel with sentencing. *See* Oct. 28, 2005 Sentencing Hearing at 21-22. In his § 2255 reply brief, Thompson does not dispute or respond to these facts concerning Clarke's withdrawal. It is unclear if Thompson is now satisfied that his trial attorney was not laboring under a conflict of interest. Regardless, he has failed to present any evidence demonstrating that Clarke actively represented conflicting interests. Thus, he has not shown he received constitutionally ineffective counsel.

## II. Brady Violation

Thompson seeks relief under § 2255 on the ground that the government withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). His argument focuses on a forensic report showing that debris samples collected from the fire tested negative for flammable or combustible liquids. *See* Thompson's § 2255 Brief Ex. C. It is unclear exactly what was tested. The forensic report, dated September 5, 2002, was not disclosed to Thompson until after the conclusion of oral argument in his direct appeal to the Seventh Circuit. In order to obtain a new trial or vacate a sentence based on an alleged *Brady* violation, Thompson must establish that the prosecution suppressed material evidence favorable to the defense. *United States v. Young*, 20 F.3d 758, 764 (7th Cir. 1994). But *Brady* only concerns information "known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976). The government

did not hide the forensic report; defense counsel was aware of its full substance before trial. Prior to trial, the government tendered to Thompson a Chicago Police Department report that stated:

EVIDENCE:

10014010 (603). One (1) pint fire debris can. Recovered by Det. L. Gates #20083. Sent to Crime Lab. for analysis.

Crime Lab Analysis is negative for flammable liquids.

*Thompson*, 523 F.3d at 811. The forensic report underlying Thompson's *Brady* claim reveals no information that was not present in the police report produced prior to trial. There is no indication that defense counsel tried to obtain the original forensic report. As the Seventh Circuit noted, "Thompson's primary defense at trial was that his mother had burned down the home, and negative test results would not have supported that theory." *Id.* Because Thompson fails to show the government suppressed exculpatory evidence unknown to the defense, he is not entitled to § 2255 relief on this ground.

## CONCLUSION

Thompson's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 is denied.

ENTER:

*Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge

May 13, 2010